IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEREMY EUGENE CHILDS,

        Case No. 2:17-00360-SI

      Petitioner,

        OPINION AND ORDER

   v.

MS. B. AMSBERRY,

      Respondent.

Susan F. Wilk
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

   Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Samuel A. Kubernick, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

   Attorneys for Respondent

SIMON, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Marion County convictions dated December 16, 2008. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) is dismissed on the basis that it is untimely.

**BACKGROUND**

On November 28, 2007, the Marion County Grand Jury indicted Petitioner on two counts of Unlawful Sexual Penetration in the First Degree, one count of Using a Child in a Display of Sexually Explicit Conduct, and one count of Sexual Abuse in the First Degree. Respondent's Exhibit 102. The charges arose from crimes Petitioner was alleged to have committed against his niece, VG, who was 10 years old at the time.

At a subsequent bench trial, the evidence showed that VG lived with her adoptive father ("GG"), mother, and younger brother. However, she would often spend time over at Petitioner's home, which he shared with his wife and two children. In the summer of 2007, VG spent the night at Petitioner's home once or twice per week where she slept on the family couch in the living room. During one of these overnight stays, she awoke to find her pajama bottoms pulled down and Petitioner photographing her bare genitals with his digital camera. According to VG's testimony, Petitioner showed her a picture of her genitalia the next day. Trial Transcript, pp. 47-48. The picture showed an "extreme close-up of a 10-year-old girl's naked vagina with [Petitioner's] two fingers pulling her

panties away from it and taking a very close-up photo[.]" *Id* at 323.

VG testified that several days after the incident involving the camera, Petitioner woke her up, "put his hands down my pants and put his finger up in my vagina." *Id* at 50. She stated that Petitioner did so at night while his wife was sleeping in the primary bedroom. VG told him she needed to use the bathroom because she did not like what Petitioner was doing to her and, when she returned from the bathroom after two or three minutes, Petitioner "just stuck his finger up there again and kept it there." *Id* at 52.

VG testified that on another occasion, Petitioner was in his bedroom talking on the telephone with his wife who was not at home at the time. He "pushed [VG] onto him[,]" put his hand down her pants and underwear, and touched her genitals on the outside. *Id* at 55-56. When she tried to get up and leave, Petitioner pushed her back down. *Id* at 74. She estimated that there were "[m]aybe five or six" different days that Petitioner inserted his finger into her vagina, but also asserted that he did this every time she came over. *Id* at 56, 67, 69-70. VG testified that she did not disclose the abuse "[b]ecause he threatened that he would kill my dad." *Id* at 57. Petitioner also gave VG money so that she would not tell anyone what he had done. *Id* at 58. VG testified that she continued to visit the house because she loved her cousins and wanted to see them. *Id* at 65.

VG's mother noticed that VG no longer seemed happy and asked if anyone had done anything to her. VG indicated in the affirmative but initially refused to disclose the perpetrator's identify. VG ultimately told her mother that Petitioner had sexually abused her, but she made the disclosure reluctantly because she "didn't want to go through this." *Id*. Her family became "kind of divided over this" and VG did not like it "because we used to be a big family and we would do a lot of things together at Christmas, Thanksgiving and everything." *Id* at 62.

At trial, Petitioner admitted that one morning he woke up early to go fishing, and "just went in and I uncovered her and took the picture." *Id* at 302. He then magnified and cropped the image on his camera, creating another photograph. *Id* at 304-05. His wife discovered these photographs inadvertently, prompting Petitioner to delete them. He claimed that when he realized he had inadvertently uploaded them to his computer, he deleted them from that device as well. Forensic experts were able to retrieve the photographs despite their deletion.

Petitioner stated that he felt ashamed of himself, but also portrayed VG as a "very flirtatious" girl who preferred to spend time with adults. *Id* at 303. He acknowledged that his criminal record included convictions for physically abusing his wife and child. He had previously admitted "abusing [his] 10-month-old child by spanking him and choking him for 20-30 seconds," but claimed during VG's trial that he had falsely confessed because the resulting guilty plea allowed him to regain his freedom in

time for the Christmas holiday. *Id* at 306. He denied sexually abusing VG in any way. *Id* at 304-06.

At the conclusion of the trial, the judge found Petitioner guilty of Using a Child in a Display of Sexually Explicit Conduct and reserved ruling on the remaining three counts until sentencing. At sentencing, the judge found Petitioner guilty of all charges:

> I have taken a look carefully at the evidence. I spent quite some time going over this and reviewing what I had and looking at my notes.
>
> * * *
>
> But really what it boils down to for me, having said that, is I really look at this in a case from what I know from the Defendant and I know from [VG], and then all these other circumstances that go around it; for instance, photographs, which are very damaging for your case.
>
> I have to look at [VG's] testimony to see how believable that is. She is very bright, articulate, and I think I can put a lot of weight on her testimony. I realize that she has problems, and people have talked about those, but I found her testimony to be very believable, particularly since it was corroborated in several respects.
>
> Based on that, and based on all the circumstances of the case, the factual evidence available, I am going to find you guilty of the offense. I think you're guilty, so that will be my decision in this case.

*Id* at 353. The trial judge found sentenced Petitioner to concurrent sentences totaling 300 months in prison.

Petitioner directly appealed his convictions, and the Oregon Court of Appeals affirmed the trial court's Judgment in a written opinion. *State v. Childs,* 243 Or. App. 129, 259 P.3d 77 (2011). The Oregon Supreme Court denied review, and the Appellate Judgment issued on October 14, 2011. 350 Or. 573, 258 P.3d 1240 (2011); Respondent's Exhibit 109.

On March 30, 2012, Petitioner filed for post-conviction relief ("PCR") in Umatilla County. On March 18, 2013, the PCR court denied relief on his claims. The Oregon Court of Appeals affirmed the PCR court's decision without issuing a written opinion, and the Oregon Supreme Court denied review. *Childs v. Taylor,* 270 Or. App. 599, 251 P.3d 89, *rev. denied,* 357 Or. 550, 357 P.3d 503 (2013). The PCR Appellate Judgment issued on August 12, 2015. Respondent's Exhibit 139.

During the pendency of Petitioner's PCR appeal, on October 28, 2013, VG traveled to the Springfield Police Department with her Aunt, TK. In an interview with Officer L. Turner, VG recanted her accusations as to Petitioner (with the exception of the undisputed nude photograph) and indicated that her adoptive father (GG) had been sexually abusing her since the time she was between four and six years of age:

> [VG] advised [GG] would touch her vagina with his fingers a "Couple times a month." She also said [GG] made her give him a "Hand job" one or two total times. And he put a hair brush inside her vagina "3 or 4" total times. [VG] said this occurred in Salem, Oregon and also in Washington State.

I asked [VG] if they ever had sexual
intercourse. [VG] said [GG] raped her in
late July, 2013. . . .

\* \* \*

[GG] also advised she lied about Jeremy
Eugene Childs . . . molesting her. [VG]
advised Childs took a photo of her while she
was on the couch. She said she woke up and
her panties were down to her ankles. When
police questioned her, she advised Childs
took a photo of her with her panties down
and she also said he molested her. [VG] said
her adopted father, [GG], was there during
her interview and she was extremely scared
of him. She lied and said Childs molested
her when it was actually [GG]. I advised she
lied about Childs, why should we believe her
now. [VG] said because [GG] is not around
and reiterated how scared she is of him and
how he threatened to hurt her if she said
anything. [VG] added that [GG] has 3 guns in
the house. She was unsure what type of guns.

\* \* \*

[VG] mentioned an accident she had back in
2004 or 2005 where she went to the doctor
because her vagina was bleeding. [VG] said
she told the doctor it was from a rocking
horse. [VG] now states it was from [GG's]
fingers.

Respondent's Exhibit 140, pp. 13-14.

Approximately two months later, on December 10, 2013, VG
met with Deputy District Attorney Jodie Bureta, the prosecuting
attorney who had prosecuted Petitioner in Marion County.
According to Bureta's subsequent report, VG "talked about
getting a lot of pressure from her family to get [J]eremy out of
prison." *Id* at 12. VG advised Bureta:

> [J]eremy [C]hilds did do something to her
> but that she was "forced to exaggerate"
> about other things. [W]hen asked
> specifically what she said she does not
> remember him ever touching her just taking a
> picture, said she remembers her stepdad
> touching her but not [J]eremy. [S]he said
> her stepdad would tell her what to say about
> [J]eremy when they were alone.

*Id*. Despite her inability to recall specific instances of touching involving Petitioner, VG referenced the time period when "[J]eremy was hurting her" and told Bureta that "he should get in trouble but not that much trouble." *Id*.

VG's recantation prompted Petitioner to file a second PCR case in Umatilla County. Typically, a person convicted of a crime in Oregon may not pursue successive PCR actions. ORS 138.550(3). However, Oregon provides statutory escape clauses which allow a PCR petitioner to overcome an untimely and/or successive PCR filing if he can demonstrate that the grounds for relief he asserts in the otherwise barred proceeding "could not reasonably have been raised in the original or amended petition." ORS 138.510(3) (untimely PCR actions); ORS 138.550(3) (successive PCR actions). Petitioner's contention was that VG's recantation prompted him to raise new claims that he could not reasonably have raised in his original PCR case.

Petitioner's appointed attorney in his second PCR case hired investigator Kenneth Herbst to assist with the collection of evidence. Herbst was able to meet with VG and her mother at the mother's residence where VG stated that her recantation was

not true. She claimed that she recanted due to pressure from TK, with whom she was living at the time:

> 5.  I then reviewed the recantation reports (Exhibit A) with [VG] and questioned her about them. [VG] told me that since she was five years old, her stepfather, [GG], had physically, mentally and sexually abused her and as a result she had suffered extreme trauma. [VG] explained to me that she suffered from "flashbacks."

> 6.  I asked [VG] whether her recantation was truthful. [VG] told me that it was not and explained that the accusations against [GG] were true but now, contrary to her recantation (Exhibit A), she claimed that petitioner had in fact touched her although she would not provide me with any specific details about that alleged abuse. When I pressed [VG] for that information on multiple occasions, she told me that she could not recall what petitioner had or had not done to her because she was traumatized and was blocking it out of her memory.

> 7.  I asked [VG] why she had made the recantation regarding petitioner and I specifically went over the documents in Exhibit A where [VG] had recanted recently to Marion County Deputy District Attorney, Jodi Bure[]ta and officer Turner of the Springfield Police Department, case number 13 10742 on October 28, 2013. I read both of these documents to her and she agreed that she had told them everything stated in the reports. [VG] added, however, that her aunt [TK] brought her to Springfield Police Department and had coached her on what to say while she was staying with [TK] for a period of two weeks immediately preceding the interviews during which her recantations were made. [VG] then told me that although [GG] was the primary abuser and the only person who had raped her, petitioner had touched her inappropriately and taken a

> picture of her vagina. [VG] reiterated to me
> that she has many doctors and therapists who
> have diagnosed her with PDSD, anxiety,
> depression and other personality disorders.

Respondent's Exhibit 143, pp. 7-8.

Faced with VG's withdrawal of her recantation as well as her explanation that TK had pressured her to fabricate the recantation, Herbst interviewed TK. TK "briefly explained to me the family background which included her sisters and herself being abused mentally, sexually, and physically by a number of different individuals in their extended family." *Id* at 9. According to TK, VG had "insisted" that TK take her to the police so she could formally recant her accusations against Petitioner. *Id*. TK disputed that she had pressured VG to recant her accusations:

> 10. I then told [TK] about my interview
> with [VG] and her claim that [TK] had
> pressured her to recant and had coached her
> on how to make the recantation. [TK] told me
> that [VG's] claim was absolutely untrue and
> again reiterated her personal belief that
> petitioner had sexually assaulted [VG],
> noting that she would never have attempted
> to pressure [VG] to fabricate a recantation
> for that very reason.
>
> 11. [TK] told me that [VG] had lived with
> [TK] and her husband for about one week
> before the recantation and [VG] had then
> left their residence claiming that [TK's
> family was] too strict.

*Id*.

The State moved for summary judgment in the second PCR action because the Petition was untimely, improperly successive, and filed despite Petitioner's ongoing litigation of his first

PCR action. Respondent's Exhibit 142, p. 3. Petitioner conceded that his Petition was untimely and successive, but asked the PCR court to allow him to proceed because he could not have reasonably raised claims in his first PCR action that were based upon a recantation that had not yet happened. Respondent's Exhibit 143. The PCR court granted summary judgment in favor of the State "for the reasons set forth by the state in the motion and related memoranda." Respondent's Exhibit 145.

Petitioner appealed the dismissal, and the State filed a Motion to Determine Jurisdiction in which it argued that the Oregon Court of Appeals lacked jurisdiction to hear the appeal. Petitioner's Exhibit 001. Specifically, the State pointed out that "in addition to being untimely and successive . . . petitioner's actual-innocence claim 'is not cognizable under Oregon's Post-Conviction Hearing Act[.]'" *Id* at 1. The Oregon Court of Appeals apparently agreed, affirming the PCR court's decision in a *per curiam* opinion in which it cited *Dillard v. Premo,* 276 Or. App. 65 (2016). *Childs v. Myrick,* 277 Or. App. 782, 380 P.3d 1192 (2016). In *Dillard*, the Oregon Court of Appeals concluded that ORS 138.525(3) "is unambiguous: petitions that fail to state a claim are meritless, and a judgment dismissing a petition as meritless is not appealable." *Id* at 67 (internal quotation omitted). In this regard, the Oregon Court of Appeals dismissed Petitioner's appeal for lack of jurisdiction. The Oregon Supreme Court denied review, 360 Or. 422, 383 P.3d 856 (2016), and the Appellate Judgment from this

second PCR action issued on November 15, 2016. Respondent's Exhibit 152.

Petitioner filed his federal Petition for Writ of Habeas Corpus on March 3, 2017. Respondent asks the Court to dismiss the Petition because Petitioner failed to timely file it.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that a one-year statute of limitations applies to federal habeas corpus litigants and begins to run once a direct appeal becomes final in state court. 28 U.S.C. 2244(d)(1). Pursuant to 28 U.S.C. § 2244(d)(2), the pendency of a PCR action tolls the AEDPA's statute of limitations so long as the PCR action is properly filed. Respondent asserts that, following the conclusion of Petitioner's direct appeal, the one-year statute of limitations was stayed only during the pendency of his first PCR action because his second PCR action was not properly filed. She therefore concludes that Petitioner permitted 647 untolled days to accrue before filing his Petition for Writ of Habeas Corpus, placing him well outside of the one-year statute of limitations.

Petitioner argues that: (1) Respondent is judicially estopped from making a timeliness argument; (2) he is eligible for statutory tolling because his second PCR action was properly filed under 28 U.S.C. § 2244(d)(2); (3) he is entitled to equitable tolling due to the errors of his PCR attorneys; (4) to the extent his Petition for Writ of Habeas Corpus is untimely, he can excuse this procedural deficiency because he is actually

innocent of sexually abusing VG; and (5) if the Court determines that he has not established his actual innocence, it should hold an evidentiary hearing to allow him to develop additional evidence. The Court takes these issues in turn.

## I.   <u>Judicial Estoppel</u>

Petitioner asserts that during his appeal in his second PCR case, the State specifically argued that the PCR court's Judgment was unappealable because his claim of actual innocence was not cognizable in a PCR action such that he failed to state a claim upon which relief could be granted. He points out that the Oregon Court of Appeals adopted this argument when it dismissed the appeal for lack of jurisdiction. He reasons that Respondent, after claiming in the Oregon Court of Appeals that the PCR action was meritless, cannot now argue that procedural deficiencies with the PCR Petition render the current federal habeas corpus case untimely.

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). "Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from "playing fast and loose with the courts.'" *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036, 1044 (9th Cir. 2004) (citing *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). "[J]udicial

estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion. *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997).

The State never conceded or abandoned its position that Petitioner's second PCR action was untimely and improperly successive. To the contrary, it specifically advised the Oregon Court of Appeals that "the post-conviction court adopted the superintendent's arguments that petitioner's actual-innocence was untimely, successive, and not cognizable under applicable law." Petitioner's Exhibit 001, p. 1. It proceeded to focus on Petitioner's failure to state a cognizable claim because, unlike the timeliness and successive petition arguments, his failure to state a claim raised a bar to appellate jurisdiction. *See Young v. Hill*, 347 Or. 165, 170-71, 218 P.3d 125 (2009). This was a reasonable argument to make, and the State in no way is taking an inconsistent position here by continuing to assert that Petitioner failed to properly file his second PCR action under Oregon's procedural rules.

## II.  **Statutory Tolling**

Petitioner also asserts that he is entitled to statutory tolling pursuant to § 2244(d)(2) for the time during which his second PCR action was pending. As recounted above, the State moved for summary judgment in the second PCR action, in part, on the basis that the PCR Petition was untimely and improperly successive. Petitioner conceded these points in his response to the State's summary judgment motion: "There is no dispute that

petitioner filed his post-conviction petition outside of the two-year statutory limitations period and that he has previously prosecuted a petition for post-conviction relief. Petitioner affirmatively alleges these facts in his pleadings." Respondent's Exhibit 143, p. 2. He asked the PCR court to excuse these procedural deficiencies because the claims he raised in the successive PCR action were based upon newly discovered evidence of his innocence, thereby bringing him within Oregon's statutory escape clauses. *Id* at 4.

When the PCR granted summary judgment for the reasons articulated by the State, it necessarily declined to adopt Petitioner's argument that his second PCR action was viable due to newly discovered evidence. In this respect, Petitioner's admitted procedural failures were not excused, and they necessarily resulted in a PCR action that was not "properly filed" sufficient to toll the AEDPA's statute of limitations.[1] *See, e.g., Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)."). (internal quotation omitted).

## III. <u>Equitable Tolling</u>

Petitioner contends that he is also entitled to equitable tolling of the AEDPA's statute of limitations where his PCR

---

[1] Even if Petitioner had "properly filed" his second PCR Petition, the resulting Judgment was unappealable as a matter of state law. Consequently, the AEDPA's statute of limitations would not have been tolled during the PCR appeals such that the Petition for Writ of Habeas Corpus would still be untimely. *See Ramirez v. Yates,* 571 F.3d 993 (9th Cir. 2009); *Almanza-Garcia v. Amsberry,* 838 Fed. App'x 301 (9th Cir. 2021).

attorneys gave him erroneous advice. He asserts that when new evidence of his innocence came to light in the form of VG's recantation, his attorney in his first PCR case counseled him to file a successive PCR action. Respondent's Exhibit 140, p. 15. He claims that there is no indication in the record that his appointed attorneys from either of his PCR actions advised him of the AEDPA's statute of limitations, and maintains that this omission was sufficiently egregious to justify equitable tolling.

Equitable tolling is potentially available to toll the one-year statute of limitations applicable to 28 U.S.C. § 2254 habeas corpus cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010). A litigant seeking to invoke equitable tolling must establish: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance prevented him from timely filing his petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). In order for Petitioner to qualify for equitable tolling, it is not enough to demonstrate garden-variety attorney error such as miscalculation of a statute of limitations. Instead, he must show "egregious attorney misconduct" that amounts to an extraordinary circumstance. *Luna v. Kernan*, 784 F.3d 640, 647-49 (2015); *see also Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007). Petitioner bears the burden of showing that this "extraordinary exclusion" should apply to him. *Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002).

Petitioner's PCR attorneys were not tasked with advising him regarding the AEDPA's statute of limitations, or to assist

him in filing a timely federal habeas corpus case. The task before them was to help Petitioner secure relief in Oregon's PCR courts. To that end, the attorneys apparently believed that, based upon VG's statements to Officer Turner and DDA Bureta, a potential avenue existed for Petitioner to excuse the procedural deficiencies associated with his second PCR action PCR action. Indeed, Petitioner's attorney in his second PCR action specifically asserted that Petitioner satisfied Oregon's statutory escape provisions to overcome his untimely and successive filing because he "could not reasonably have raised the claims which are now before the Court because [VG's] recantation and subsequent statements occurred after judgment was entered against him in his first post-conviction action." Respondent's Exhibit 143, p. 4.

Petitioner claims that his PCR attorneys nevertheless had an obligation to ensure his federal habeas corpus case would be timely. He directs this Court's attention to the Ninth Circuit's unpublished opinion in *Benjamin v. Kelly,* 2022 WL 1285040 (9th Cir., Apr. 29, 2022). In that case, the Court of Appeals found circumstances justifying equitable tolling where the habeas petitioner:

> frequently wrote his [PCR] lawyer to inquire about the status of his case and, on numerous occasions, sought his lawyer's advice as to whether the time for filing his federal habeas petition was running. Time and time again, Benjamin's lawyer assured him, albeit erroneously, that the statute of limitations was tolled during the state post-conviction relief appeal.

* * *

> Here, Benjamin has shown that his lawyer's actions qualify as an extraordinary circumstance. Throughout his representation, Benjamin's lawyer continually misled him about when the [AEDPA's] statute of limitations was running on what was likely [Benjamin's] single opportunity for federal habeas review, thus seriously prejudicing him.

*Id* at 1-2 (internal quotations omitted).

Unlike the situation in *Benjamin,* there is no indication that Petitioner's PCR attorneys repeatedly misled him with regard to the AEDPA's statute of limitations thereby causing his untimely filing of this action. Instead, he reasons that because Oregon's state courts ultimately concluded that VG's recantation failed to satisfy Oregon's statutory escape clauses so as to render his second PCR action untimely,[2] the assistance of his PCR attorneys in pursuing that course of action must necessarily be an extraordinary circumstance that prevented him from timely filing this case. Petitioner's PCR attorneys' unsuccessful pursuit of state post-conviction remedies on his behalf in the wake of newly discovered evidence does not amount to an extraordinary circumstance justifying equitable tolling of the AEDPA's statute of limitations.

## IV. Actual Innocence

Petitioner next asks the Court to excuse his untimely filing because, while he is guilty of photographing VG, he is

---

[2] It bears repeating that at the time Petitioner filed his second PCR case, VG had not yet disavowed her recantation.

actually innocent of his three convictions stemming from physically abusing her. He can excuse his failure to timely file this case if he can make a gateway showing of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In order to make such a showing, Petitioner must present "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). The Court must then consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not" to resolve the question whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id; Lee v. Lampert,* 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (internal quotations omitted). The "actual innocence exception remains only a safety valve for the extraordinary case." *Schlup,* 513 U.S. at 333 (O'Connor, J., concurring) (internal quotation omitted).

Where Petitioner's claim of innocence is dependent upon VG's recantation, the Court must determine whether "every juror would credit her recantation testimony over her trial testimony." *Jones v. Taylor*, 763 F.3d 1242, 1250 (9th Cir. 2014). "Recanting testimony has long been disfavored as a basis for a claim of innocence" and is to be viewed "with extreme suspicion." *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (Kozinski, J., dissenting); *see also Haouari v. United States,* 510 F.3d 350, 353 (2nd Cir. 2007) ("It is axiomatic that witness recantations must be looked upon with the utmost

suspicion") (internal citation omitted). As the Ninth Circuit stated in *Jones*:

> As a general matter, "[r]ecantation testimony is properly viewed with great suspicion." *Dobbert v. Wainwright,* 468 U.S. 1231, 1233, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari); *see also Allen v. Woodford,* 395 F.3d 979, 994 (9th Cir. 2005). "Recanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." *Carriger,* 132 F.3d at 483 (Kozinski, J., dissenting). "It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives...." *Dobbert,* 468 U.S. at 1233–34, 105 S.Ct. 34. For these reasons, a witness' "later recantation of his trial testimony does not render his earlier testimony false." *Allen,* 395 F.3d at 994; *see also Christian v. Frank,* 595 F.3d 1076, 1084 n. 11 (9th Cir. 2010). Rather, a witness' recantation is considered in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors. *See Christian,* 595 F.3d at 1084 n. 11 (considering the timing of the witness' recantation and the contents of his earlier testimony in assessing the weight of the recantation); *Graves v. Cockrell,* 351 F.3d 143, 153 (5th Cir. 2003) (noting that a recanting witness had given numerous contradictory statements in assessing the weight to give to his new testimony).

*Id* at 1248.

In this case, VG's recantation was not timely; she waited approximately five years after Petitioner's conviction to come forward with an admission that she had lied. She also did so

during the very short time she lived in TK's home, a time frame
that spanned only one or two weeks. TK claimed that VG "insisted
that she be taken to law enforcement to make a formal
recantation about her accusations against petitioner."
Respondent's Exhibit 143, p. 9. However, a reasonable juror
could find it improbable that VG would suddenly insist on such a
course of her own volition five years after Petitioner's
convictions and that the more likely explanation was VG's
representation that TK pressured her to recant during the brief
time VG was living in TK's home. This is especially true where,
two months after she delivered her recantation to Officer
Turner, VG told Bureta that she was "getting a lot of pressure
from her family to get Jeremy out of prison," and still
maintained that there was a time that "Jeremy was **hurting her**,"
not that he had only photographed her on one occasion while she
slept. Respondent's Exhibit 140, p. 12 (bold added). Unlike her
statements to Officer Turner, VG's statements to DDA Bureta that
she could not remember Petitioner touching her is not tantamount
to a denial that the touching never occurred.

Not only could a rational juror conclude that VG falsely
recanted her accusations due to family pressure, but
Petitioner's own trial testimony cast doubt on his credibility
and, thus, his gateway claim of actual innocence. As mentioned
in the Background of this Opinion, he attempted to explain away
his conviction for physically abusing his 10-month old son by
claiming he lied to the judge when he entered his plea so as to
be home in time for Christmas. Petitioner either lied to the

judge when he entered his plea, or he lied while testifying under oath in Marion County in 2008.

Petitioner also testified that when police confronted him with VG's allegations, he denied ever having touched or photographed her inappropriately. However, after forensic specialists retrieved the deleted images from his computer, he was forced to admit at trial that his statement regarding the photographs to law enforcement were not true. Trial Transcript, p. 307.

During his direct examination, Petitioner testified that he felt shame for photographing VG, and initially told the prosecutor during cross-examination that he was instantly disgusted with himself for photographing VG. When she asked whether he was disgusted with himself before or after he made a copy of the photo, magnified it, and cropped it in order to make the image more vivid, Petitioner claimed that he had manipulated the photograph before feeling disgusted with himself. *Id* at 315. Even assuming Petitioner felt genuine disgust after editing the photo, this does not explain why he refrained from deleting the photographs from his camera until his wife inadvertently discovered them, or why he told his wife that he did not know why the photographs were on his camera when he obviously took them. *Id*.

Moreover, despite admitting that he had photographed VG's bare vagina and edited the photograph, Petitioner inexplicably testified that he did not do so for any sexual purpose. Although the prosecutor asked him what reason he had to take the

photograph, and why he would only photograph her vagina and no other part of her if it wasn't for a sexual purpose, Petitioner was unable to formulate an answer. *Id* at 312-13. The fact that Petitioner took the photograph in the first place, coupled with his dubious testimony, significantly detracted from his credibility.

Petitioner's wife also made statements to law enforcement that were damaging to his case. She told an investigating officer that "she was not 'surprised' by the allegations" VG had made. Respondent's Exhibit 118, p. 10. She "was suspicious that something might have been 'going on' between Jeremy and [VG], stating to Lt. Stai that [VG] was always sitting on his lap, following him into the bathroom, etc." *Id*. She also told the police officer "that she told Jeremy that she didn't want [VG] coming over all the time, but Jeremy insisted that the visits continue, and they did." *Id*. At trial, Petitioner's wife confirmed that she made these statements to the authorities. Trial Transcript, pp. 93-95.

Petitioner contends the evidence shows that her father abused her, and that VG told Officer Turner that her father pressured her to fabricate charges of sexual abuse against Petitioner. However, it seems unlikely that at the time GG was allegedly persuading VG to falsify charges of sexual abuse against Petitioner, Petitioner happened to photograph her bare vagina while she was sleeping. In addition, any sexual abuse VG may have suffered from GG does not rule out sexual abuse by

Petitioner also.[3] Based upon the totality of the record, a reasonable juror could conclude that: (1) Petitioner's trial testimony was not truthful; (2) the photograph showed that he had a sexual interest in VG; (3) the fact that he photographed VG's vagina made it likely that he also touched her as she alleged; and (4) VG's belated recantation had been coerced by TK during the time VG was living in TK's home such that the recantation did not cast doubt on her trial testimony. For all of these reasons, Petitioner cannot establish that no reasonable juror would have convicted him in light of his newly presented evidence.

## V. Evidentiary Hearing

Petitioner asks the Court to hold an evidentiary hearing if it finds he has not met his burden of establishing his actual innocence under *Schlup*. Petitioner's claim of actual innocence is not sufficiently meritorious to warrant an evidentiary hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (where the record in the case precludes habeas relief, a district court is not required to hold an evidentiary hearing).

///

///

///

///

///

///

---

[3] When Herbst interviewed TK, she told him that mental, physical, and sexual abuse was rampant in her extended family. Respondent's Exhibit 143, p. 9.

**CONCLUSION**

The Petition for Writ of Habeas Corpus (#2) is dismissed as untimely, and Petitioner's request for an evidentiary hearing is denied. The Court does, however, grant a certificate of appealability as to whether Petitioner can excuse the untimely filing of his Petition for Writ of Habeas Corpus.

IT IS SO ORDERED.


October 20, 2022
          DATE                          Michael H. Simon
                                        United States District Judge

25 – OPINION AND ORDER